Grafton,
March 4, 1913.

## EDWARD B. KAMBOUR v. BOSTON & MAINE RAILROAD.

The fact that one has knowledge of a danger created by another's negligence and voluntarily encounters the risk incident thereto does not preclude him, as matter of law, from recovering for an injury thereby sustained.

In the absence of contract or some special relation, the duty to act for the purpose of protecting others from injury is not recognized as a legal obligation; but if one assumes so to act, he is bound to exercise the care of the ordinary man in a similar situation.

The rule of law expressed in the maxim *volenti non fit injuria* does not relieve the defendant in an action for negligence from liability, unless the evidence is sufficient to warrant a finding that the person injured procured or consented to the act or omission of which he complains.

When it is apparent that a passenger upon a railway train does not appreciate the danger to which his conduct exposes him, it is the duty of the company's servants to exercise ordinary care to prevent him from needlessly exposing himself to the risk of injury.

The fact that a boy fourteen years of age and with little experience in riding upon railways jumped from a slowly moving train, in accordance with a practice known to the company's servants and concerning which they had given no warning, is not conclusive evidence of contributory negligence on his part.

It is within the limits of legitimate advocacy for counsel to state as matter of fact an inference which may fairly be drawn from the evidence, but concerning which there is no direct testimony.

CASE, for personal injuries. Trial by jury and verdict for the plaintiff. Transferred from the May term, 1911, of the superior court by *Pike*, J., on the defendants' exceptions to the denial of a motion for the direction of a verdict in their favor and to a remark of the plaintiff's counsel in closing argument.

The plaintiff was less than fourteen years old at the time of his injury. He lived in Blair and attended school in Plymouth, riding back and forth every day over the defendants' road. The train on which he came to Plymouth usually slackened speed at a crossing near the school, and when that happened the plaintiff and several other boys would jump off. The plaintiff jumped from the train on the morning of the accident, fell under a car, and received the injury for which he seeks to recover. He knew that if he jumped he might be injured, but did not think such a result was probable. The defendants knew that the boys were accustomed to jump off at the crossing and that such practice was dangerous, but did nothing to prevent it.

*Alvin F. Wentworth, Martin & Howe,* and *Remick & Jackson* (*Mr. Howe* and *Mr. Jackson* orally), for the plaintiff.

*Burleigh & Adams* and *Branch & Branch* (*Oliver W. Branch* orally), for the defendants.

YOUNG, J.    The defendants insist that the court erred in denying their motion for a directed verdict because, as they say, it conclusively appears (1) that the plaintiff assumed the risk of his injury, (2) that they were free from fault, and (3) that he was guilty of contributory negligence.

1. Although the plaintiff did not think it was dangerous to jump from the train when and as he did, he knew that if he jumped he might be injured; that is, although he did not know how dangerous jumping from a moving train really was, he knew it was accompanied with more or less danger.    From this, the defendants say, it follows that he cannot recover, even though he was free from fault and the accident would not have happened but for their failure to perform a duty the law imposed on them for his benefit.    They base their contention on the proposition that there is a principle of the common law which prevents one who is injured while voluntarily encountering a known danger from recovering any loss or damage he may sustain from those whose misconduct caused his injury, regardless of the fact that the ordinary man would have done what he did.    In other words, they say that the rule which permits a person to recover whatever loss or damage he may sustain from those whose misconduct caused his injury (*Nashua etc. Co.* v. *Railroad,* 62 N. H. 159, 161) is a rule of limited application.    The question, however, is not as to the force and effect of that rule, but as to whether the principle for which the defendants contend prevents passengers who are free from fault from recovering for a loss caused by a carrier's failure to perform a duty the law imposed on him for their benefit, simply because they knew of his failure and voluntarily encountered the risk incident thereto.    The question, therefore, on this branch of the case is whether the fact that a passenger is injured while voluntarily encountering a known danger is conclusive of his right to recover, when it is not conclusive of either his fault or the carrier's freedom from fault.    It will be of assistance in considering this question to remember just what the defendants' contention is, and that the reason they say passengers cannot recover, when it appears they know of the danger and fully appreciate the risk, is

because these facts operate to relieve the carrier from a consequence that would otherwise result from his misconduct, and not because these facts are conclusive of either their fault or his freedom from fault.

If the defendants' contention is sound, the mere fact a person voluntarily encounters a known danger makes him an outlaw, in so far at least as those responsible for the danger are concerned. They concede this when they say these facts operate "to relieve a defendant from consequences which would otherwise result from his negligence." Since this is the effect of the defendants' principle, it is improbable that it is a rule of the common law. In fact, the mere statement of their position ought to be enough to demonstrate its absurdity. The defendants, however, insist not only that there is such a principle, but that it is a rule of universal application. To sustain their contention they rely on an article in 20 Harvard Law Review 14, entitled "Voluntary Assumption of Risk," cases holding that servants assume the risk of all injuries caused by the known dangers of the service, the maxim *volenti non fit injuria,* and cases in which the facts that the plaintiffs were injured while voluntarily encountering a known danger and were not permitted to recover are the only ones they have in common. The defendants' first contention is based on the proposition that if one notifies those who come on his premises by his invitation of all the dangers incident to the visit of which he does and they do not know, they cannot recover. According to the defendants, the principle which produces this result is the same as the one which permits a person to relieve himself by contract from the consequences of his misconduct and is tersely expressed in the maxim *volenti non fit injuria.* It has been held in this state that a person cannot relieve himself from liability for the consequences of his future misconduct by a contract freely and fairly made. *Piper* v. *Railroad,* 75 N. H. 228; *Baker* v. *Railroad,* 74 N. H. 100; *Peerless Mfg. Co.* v. *Railroad,* 73 N. H. 328. This tends to prove that the defendants' principle is no part of the common law of this state. But passing that for the present, the defendants' contention, briefly stated, is that a passenger (or, for that matter, any one who is injured by the misconduct of others) is remediless if he knew of the danger and voluntarily encountered it. Is there such a rule of the common law?

It has been held in this state that servants who are free from fault cannot recover for injuries caused by their master's failure to maintain the things he provides for their use in the condition the statutes

make it his duty to maintain them (*Allen* v. *Railroad*, 69 N. H. 271), or in that the ordinary man would maintain them (*Hicks* v. *Company*, 74 N. H. 154), if the servants knew of his failure, fully appreciated the risk incident thereto, and voluntarily encountered it. *Leazotte* v. *Railroad*, 70 N. H. 5. These cases are relevant to the defendants' contention, but their weight depends upon why a recovery was denied; that is, whether it was denied because assumption of risk is purely a matter of contract (*Olney* v. *Railroad*, 71 N. H. 427, 431), or because the only duty the law imposes upon a master for the benefit of his servants, in so far as his instrumentalities are concerned, is to notify them of the dangers of the service of which he does and they do not know (*Bennett* v. *Company*, 74 N. H. 400), or whether, as the defendants contend, it is because these facts operate to relieve the master from a consequence that would otherwise result from his misconduct. If assumption of risk is purely a matter of contract, or by it is intended that a master owes his servants no duty in so far as the known dangers of the service are concerned, the doctrine has little or no tendency to sustain the defendants' contention.

It will be useful, however, before considering these questions, to review briefly the history of the development of the remedies the law gives to one who has been injured by the acts of others, especially the history of the action of case. The original remedy for such injuries was an action of trespass. This gave the injured person a recovery both when his injury was intentionally and when it was negligently inflicted. Wigmore Tort. Respons., 3 Select Essays 474, 504. At that time the law looked at the consequences of an act, rather than its character or the intent with which it was done. Jenks Theory of Torts, 19 L. Q. Rev. 19, 25. This remedy was not available unless the plaintiff's injury was the direct result of force applied to his person or property without his permission. There could be no recovery if the injury resulted indirectly from the act, nor if the plaintiff consented to the doing of the act which caused the injury. This was the law previous to 1285, when a statute was enacted permitting the chancellor, when none of the old writs was applicable, to frame new ones *in consimili casu.* Thayer Ev. 66. After the passage of this statute, the court permitted those who were injured because of (but not directly by) the acts of others to recover in case whenever they could have recovered in trespass if their damage had resulted directly from the act complained of. The court held such an injury to be similar to a tres-

pass. For example: before the passage of the statute, if builders threw a log from a window and it struck a person in the street, he could recover; if, however, he fell over the log he was remediless; but after its enactment he could recover in either case. *Reynolds* v. *Clarke*, 1 Str. 634, 636. Although the statute as thus construed increased the number of actionable wrongs, one who was injured by the acts of those exercising any of the common trades or professions could not recover, no matter how negligent they might be; but before the sixteenth century the court had so modified its construction of the statute that one who was so injured could recover. One of the first recorded instances in which the broader rule of liability was applied was a suit for drowning a horse through the misconduct of a ferryman in overloading his boat. Y. B. 22 Ass. 94, *pl.* 41; 3 Select Essays 260. The idea that it is the duty of every one not to do anything that he knows or ought to know will injure or damage others unreasonably (*Huskie* v. *Griffin*, 75 N. H. 345) had not been considered by the court at that time; but the duty to do what one agrees to do, and its corresponding liability, were being developed. Salmond Hist. Cont., 3 Select Essays 320, 325. Accordingly, the court held that when one undertakes to do anything for another for a reward, he agrees to use the care and skill of the average man exercising that trade or profession in that vicinity, and that damages for breach of this agreement can be recovered in an action sounding in case. In other words, the court held that by such holding himself out as exercising the trade or profession, the defendant represented that he possessed the skill of the average man exercising that trade or profession in that vicinity (*McBride* v. *Huckins*, 76 N. H. 206) and agreed to use it for the benefit of whoever employed him. *Leighton* v. *Sargent*, 31 N. H. 119.

Two of the many conclusions reached by the courts in elaborating their views on this question have an important bearing upon the question now under consideration. One is that when there were dangers peculiar to doing the work contemplated by the contract, of which one of the parties did and the other did not know, it would be held that the one who knew agreed to protect the other from loss in so far as such dangers were concerned. The other is that when the dangers were known to both parties, it would be held, if the contract was silent, that as to such dangers neither party owed the other any duty. The fact that the contract was silent was held to negative the idea of any duty on the part of either to protect the other from injury. 20 Harv. Law Rev. 14–31.

In the sixteenth century, therefore, one who was injured either by or because of the act of others, when their relation was not contractual, could recover both when he did not know of the danger, and when he knew of and voluntarily encountered it; but when the relation resulted from an agreement or understanding, the injured party could not recover save for injuries caused by a breach of the agreement. Consequently he could not recover when the contract was silent, if he was injured by a danger he knew was peculiar to the undertaking. Ames Hist. Assump., 3 Select Essays 260. In other words, as the law was understood at that time, the reciprocal duties of the parties depended on how the relation between them was created. It was the duty of every one to use care not to injure or damage those with whom he came in contact. 1 Bl. Com. 40. It was the duty of those brought together by virtue of a contract to use care not to injure or damage each other in what they agreed to do. The following from Blackstone illustrates this view of the law: "If a smith's servant lames a horse while he is shoeing him, an action lies against the master, and not against the servant." 1 Bl. Com. 431. If an action lies againt the master, why not against the servant whose misconduct lamed the horse? Obviously, because the owner of the horse had no contract with the servant, and the horse came rightfully under the servant's control. In such cases there could be no recovery because there was neither wrongful possession nor breach of contract. The owner of the horse had a contract with the blacksmith, which made it his duty to use care in shoeing the horse; consequently he was liable for a failure to perform that duty. 2 Harv. Law Rev. 1, 18. This view of imposed duties prevailed until the middle of the nineteenth century, and during all that time it was necessary to know how the relation which brought the parties together was created in order to determine their rights and liabilities. Special rules were gradually adopted and applied to the more common relations, as landlord and tenant, and carrier and passenger. These rules were all based upon the proposition that when the relation was created by contract neither of the parties owed the other any duty as to known dangers. *Priestley* v. *Fowler*, 3 M. & W. 1.

The view that it is no one's duty to do anything to protect others from injury when their relation is not contractual, and the view that there is in contractual relations a duty to use care as to dangers not known to one party and not mentioned in the contract, constantly acted and reacted on each other. But in the first half of the

ninetcenth century it was still the accepted view that imposed duties were peculiar to the relation which brought the parties together. When the relation was created by contract, the test of duty as to a particular danger was to inquire whether the defendant did and the plaintiff did not know of it; but when the relation was not created in that way, the test to determine whether either party was in fault was to inquire whether he did what the ordinary man would have done to avoid the accident. *Brown* v. *Collins*, 53 N. H. 442; Holmes Com. Law 78, 125. If the relation was created by contract, it could not be found that one was in fault in so far as known dangers were concerned; but when the relation was not created in that way, the facts that one knew of the danger and voluntarily encountered it were not conclusive of his right of recovery, but were merely evidence to be considered on the issue of his care.

One thing more should be remembered. As has already appeared, in the infancy of the common law the only question was whether the defendant's act caused the plaintiff's injury. But in time it began to be questioned whether that was enough—whether the plaintiff should not show both that he was injured by the defendant's act and that the act was illegal. Holmes Com. Law 80, 100. While this idea developed slowly, it was a well recognized rule by the middle of the nineteenth century, in this state at least (*Brown* v. *Collins*, 53 N. H. 442); and the attempts that have been made since that time to measure rights and liabilities with rules devised for that purpose before this principle obtained recognition are responsible for much of the confusion to be found in the books in respect to imposed duties.

With these facts in mind, we are in a position to understand what was intended by what was said in *Priestly* v. *Fowler*, 3 M. & W. 1. This case is credited with originating the doctrine of assumed risk and has been severely criticised. With so much of the opinion as relates to the right of a servant to recover from his master for injuries caused by the negligence of a fellow-servant we have no concern. If all that has been said in respect to this feature of the Priestley case is true, it is wide of the mark in this case. But that was not the only question considered. The declaration charged the defendants with fault in failing to furnish the plaintiff a safe wagon. The court held the declaration to be insufficient because the plaintiff failed to allege that the defendants did and he did not know the wagon was unsafe. The court applied the same test to determine whether the defendants were in fault, in so far as the wagon was

concerned, that was applied in all cases in which the relation which brought the parties together was created by contract. It held that the only duty the law imposes on a master for the benefit of his servants, in so far as instrumentalities are concerned, is to notify them of all the dangers incident to the use of the things he provides of which he does and they do not know. *Bennett* v. *Company,* 74 N. H. 400. As we have seen, this rule rests on the proposition that the only duties a master owes his servants (or, for that matter, the only duties servants owe their master) are those created by the contract of service; and the fact that the contract is silent as to known dangers negatives the idea of any duty imposed on either of the parties for the benefit of the other in so far as such dangers are concerned. All that was decided in *Priestley* v. *Fowler,* in so far as the master's duty as to instrumentalities is concerned, was that he owed the servant no duty as to known dangers. As has already appeared, that was true of an invitor and his guest (*Indermaur* v. *Dames,* L. R. 2 C. P. 311) and of a landlord and his tenant (*Cate* v. *Blodgett,* 70 N. H. 316), although the rule was otherwise when one was injured while in the exercise of his legal rights. In the latter case, the facts that the plaintiff knew of the danger and voluntarily encountered it were only evidence on the question of his care. There was nothing new or revolutionary, therefore, in the conclusion that the plaintiff could not recover if he knew the wagon was defective and voluntarily encountered the risk incident thereto. The novelty in the case was the conclusion that the rule *respondeat superior* did not apply. That was calculated to attract attention; for the court had held for nearly half a century (Wigmore Tort. Respons., 3 Select Essays 528) that a master was liable for anything his servants did in the course of their employment, in the same way and to the same extent as though he had done the acts complained of. *Priestley* v. *Fowler* decides that a master owes his servants no duty in so far as the known dangers of the service are concerned. It does not decide that the servants' knowledge of the danger operates as an excuse for the master's failure to perform a duty owed to the servants.

A careful reading of the opinion in *Farwell* v. *Railroad,* 4 Met. 49, will disclose that the Massachusetts court so understood the Priestley case. The Farwell case was decided in 1842, five years after the Priestley case. The question under consideration was whether the rule *respondeat superior* applied between servants and their master. It was held that the plaintiff could not recover because the

chance of being injured by the negligence of a fellow-servant was one of the usual and ordinary risks of the service; that is, it was one of the risks the plaintiff must have had in mind when he made his contract of service. Consequently, the fact that the contract was silent on this subject negatived the idea that it was the defendants' duty to do anything to protect the plaintiff from such dangers. When the court said that servants assume the ordinary risks of the service, it did not intend to hold that one who was free from fault could not recover for an injury caused by the defendants' failure to perform a duty imposed upon them for his benefit. What was intended was that because the plaintiff knew of the danger when he made his contract with the defendants, it could not be found that they were in fault. It is impossible to place any other construction upon the opinion. What is there said of the effect of the plaintiff's contract upon his right to recover is consistent with this theory, but not with any other. When it is said that Farwell assumed the ordinary risks of the service, the risks referred to were those as to which the defendants owed him no duty, or those that remained after they had done all the law made it their duty to do to enable him to perform his work in safety. The case does not hold that a servant assumes the risk of injury caused by the master's failure to perform a duty imposed upon him, nor that the servant cannot recover if he is free from fault and the master's misconduct is the legal cause of his injury. It was not understood by either of these courts that the facts that a servant knew the danger of which he complains, fully appreciated the risk incident thereto, and encountered it rather than risk the loss of his employment, operated to release the master from a consequence of his misconduct for which he would otherwise be liable.

These cases, therefore, which are commonly credited with originating the doctrine of assumed risk, have no tendency to sustain the defendants' contention; for notwithstanding they tend to prove that it is a rule of the common law that one who is injured while voluntarily encountering a known danger cannot recover, they also show that the rule is of limited application only and had no force unless the relation of the parties is purely contractual.

It is now held in England that it is the master's common-law duty to do whatever is reasonably necessary to enable his servants to do their work in safety (*Williams* v. *Company*, [1899] 2 Q. B. 338), and that those who are injured by his failure to perform it can recover if they are free from fault, notwithstanding they knew of his

failure, fully appreciated the risk incident thereto, and voluntarily encountered it.   Smith v. Baker, [1891] A. C. 325.   This change in the law took place between 1887 and 1891.   One Thomas fell into an unfenced vat and was injured.   The jury found that he was free from fault and that the defendants' failure to fence the vat caused his injury.   This was in 1887.   The defendants moved for a directed verdict.   One of the three judges thought their motion should be denied because it was their duty to do whatever the ordinary man would have done to enable the plaintiff to do his work in safety.   The other two judges conceded that if that were the defendants' duty, it would be no answer to show that the plaintiff knew of their failure to perform it and voluntarily encountered the risk incident thereto; but they held that the facts he knew of the danger incident to working near the vat and voluntarily encountered the risk incident thereto negatived the idea of any duty on the defendants' part to do anything to prevent his falling into the vat. Thomas v. Quartermaine, 18 Q. B. Div. 685, 697–702.   Although from 1860 occasional cases are to be found in which the court questions the soundness of the rule, that the only duty the law imposes on a master for the benefit of his servants is that of notifying them of the dangers of the service of which he does and they do not know, still up to that time (1887) no case had been decided which held that he owed them any other duty.   The time for a change in the law, however, had come.   The great mass of the people thought that the principle which permitted a master to take advantage of his servants' necessities was but another way of saying that it is permissible for the strong to exploit the weak.   This view of the matter reacted on the court, and caused it to criticise the majority view and to limit its application almost as soon as it was announced (Yarmouth v. France, 19 Q. B. Div. 647; Thrussell v. Handyside, 20 Q. B. Div. 359; Membery v. Railway, 14 App. Cas. 179, 186), and four years later it was overruled.   Smith v. Baker, [1891] A. C. 325.   In other words, in 1891 the house of lords held that it is the master's duty to do whatever is reasonably necessary to enable his servants to do their work in safety, and that they can recover if they are injured by his failure to perform it.   Williams v. Company, [1899] 2 Q. B. 338; 20 Harv. Law Rev. 105.   Perhaps it is doubtful as to just what this court would hold masters are bound to do in the way of protecting their servants from injury.   Allen v. Railroad, 69 N. H. 271; Carr v. Electric Co., 70 N. H. 308; Olney v. Railroad, 71 N. H. 427; Saucier v. Spinning Mills, 72 N. H. 292; Murphy v.

*Railway*, 73 N. H. 18; *Hicks* v. *Company*, 74 N. H. 154; *Charrier* v. *Railroad*, 75 N. H. 59; *Fontaine* v. *Company*, 76 N. H. 163. But however that may be, the defendants concede that the rule which obtained in England in 1837 and in Massachusetts in 1842 is not the law in this state; and as there has been no legislation on the subject, the natural question is, what caused the change?

The duty to take action to protect others from injury is not recognized as a legal obligation, in the absence of contract or some special relation. *Buch* v. *Company*, 69 N. H. 257, 261. But according to the view now generally accepted, when one takes action it is his duty to do what the ordinary man would do in that situation. *Huskie* v. *Griffin*, 75 N. H. 345. This change was very gradual until near the end of the eighteenth or the beginning of the nineteenth century. The great change in industrial conditions that began at that time soon caused many persons to question whether if one did nothing to others, let them absolutely alone, he was free from fault so far as known dangers were concerned. The rapidity with which this change took place was due to the invention of the steam engine and its use in manufacturing and transportation. Accidents peculiar to working on power-driven machinery continued to increase with the increased use of such machinery, and it soon became apparent that merely notifying servants of the dangers incident to operating such machinery was not enough to prevent this constant increase in the number of preventable accidents; that nothing less than action on the part of the master would do that. This led men to inquire whether masters ought not to do whatever was reasonably necessary to enable their servants to do their work in safety; and it soon became the generally accepted view of thinking men that that ought to be the master's duty, or that he ought to do whatever is reasonably necessary, in the way of guarding his machinery and in making and enforcing rules, to enable his servants to do their work in safety. In short, the old rule which permitted a master to exploit his servants, or to take advantage of their necessities and expose them to the risk of almost certain injury in order to save the few dollars it would cost to guard his machinery and to make and enforce the rules necessary to enable them to do their work in safety, broke down when applied under modern industrial conditions to determine the rights and liabilities of the parties.

This change in public opinion proceeded so fast that the idea a master should do whatever is reasonably necessary to enable his servants to do their work in safety had begun to crystallize before

*Priestley* v. *Fowler* was decided, and by 1860 had so far reacted on the court that it held that that was the master's duty.  *Fifield* v. *Railroad*, 42 N. H. 225, 235.   This reaction, however, had not proceeded far enough for the court to hold that servants could recover when they could not have recovered, as the law was then understood, if the contract which brought the parties together had been one creating any of the other common relations with which the court. was familiar, as, for example, that of landlord and tenant.   *Cate* v. *Blodgett*, 70 N. H. 316.   As long as the court thought that the facts that servants knew of the danger and voluntarily encountered it were conclusive of their right to recover, it made no practical difference whether the reason given for denying a recovery was that these facts were conclusive of the master's freedom from fault, or that "assumption of risk is purely a matter of contract"; and the only theoretical difference it made was that one view was, and the other was not, conducive to straight thinking.   *Carr* v. *Electric Co.*, 70 N. H. 308.   If, however, the court thinks it is the master's duty to act to protect his servants from injury, the rule that servants who are injured by a known danger cannot recover is not only an anomaly, but well calculated to work injustice in all cases in which it cannot be said that notifying his servants of the danger is all the ordinary man would do to enable them to do their work in safety.

Although the cases in which assumption of risk has been elaborated are well calculated to introduce confusion into the law, they have no great tendency to sustain the defendants' contention that passengers assume the risk of all injuries that are caused by known dangers; and in so far as their contention depends for its validity on the proposition that passengers assume the risk of such injuries because servants assume the risk of all injuries caused by the known dangers of the service, it is fallacious.   The mere facts that servants know of a danger peculiar to doing what they are employed to do and voluntarily encounter it are never conclusive of their right to recover when the ordinary man would have done what they did, unless they are conclusive of an agreement on their part to assume the risk of their injury (*Olney* v. *Railroad*, 71 N. H. 427), or the court can say or the jury finds that notifying them of the danger is all the ordinary man would have done for their safety.   In all other cases servants are permitted to recover, notwithstanding they knew of the danger of which they complain, fully appreciated the risk incident thereto, and voluntarily encountered it.   For example, servants who are injured by their master's personal misconduct are permitted to

recover, and the liability of being injured in that way is one of the known risks of every employment. In fact, this court has held both that it is the master's duty to maintain instrumentalities in the condition in which the ordinary man would maintain them (*Genest* v. *Company*, 75 N. H. 365; *Caldon* v. *Company*, 75 N. H. 532; *Bouthet* v. *Company*, 75 N. H. 581), and that servants do not assume the risk of injuries caused by his misconduct. *Goodale* v. *York*, 74 N. H. 454. This is true of England (*Williams* v. *Company*, [1899] 2 Q. B. 338) and several of the states. *Hicks* v. *Company*, 138 N. C. 319; *Chicago etc. Co.* v. *Mueller*, 203 Ill. 558; 1 Labatt M. & S., ss. 2, 3. The English court carried this view of the law to its logical conclusion when it held that the fact that servants know of their master's failure to perform a duty the law imposed on him for their benefit was not conclusive of their right to recover, but merely evidence to be considered on that issue (*Smith* v. *Baker*, [1891] A. C. 325; *Williams* v. *Company*, [1899] 2 Q. B. 338; 2 Harv. Law Rev. 107), and that should be done in this state; that is, servants who are free from fault should be permitted to recover when they are injured by their master's failure to maintain his instrumentalities in the condition in which the ordinary man would maintain them, unless the court can say or the jury finds that notifying them of the dangers incident to the defect of which they complain is all the ordinary man would have done for their protection. *Smith* v. *Baker*, [1891] A. C. 325; *Dakan* v. *Company*, 197 Mo. 238; 1 Labatt M. &. S., ss. 60–66. Notwithstanding this court has not taken the final step necessary to reconcile its holding that it is the master's duty to do what the ordinary man would do to enable his servants to do their work in safety (*Fifield* v. *Railroad*, 42 N. H. 225, 235) with the one that servants do not assume the risk of injuries caused by their master's misconduct (*Goodale* v. *York*, 74 N. H. 454, 456), still the doctrine of assumption of risk is in no sense a rule of universal application, even in so far as the law of master and servant is concerned. In fact, its application is so limited that it can hardly be called a rule of law.

Although this court has been holding for a quarter of a century, at least, that it is every one's duty to do what the ordinary man would have done to enable those with whom he comes in contact to attend to their affairs in safety, both when the relation which brings the parties together is (*Kimball* v. *Norton*, 59 N. H. 1) and when it is not created by contract (*Nashua etc. Co.* v. *Railroad*, 62 N. H. 159), more than traces of the view that imposed duties are

peculiar to the relation which brings the parties together are still to be found in the rules the court is in the habit of applying to determine the rights of the parties. In other words, notwithstanding the court now holds it is every one's duty to do what fifty years ago it held was no one's duty, the tests it applies to determine the rights of the parties are still the ones it devised when it thought of duties as peculiar to the relation which brought the parties together, and not as resulting from the application of the general rule to all the various situations in which a person may find himself in the pursuit of business or pleasure. For example, it holds that it is a carrier's duty to do whatever is reasonably necessary to protect his passengers from injury (*Wheeler* v. *Railway*, 70 N. H. 607), and that he cannot relieve himself by contract freely and fairly made from liability for the consequences of his future misconduct. *Baker* v. *Railroad*, 74 N. H. 100. On the other hand, it holds that an agreement to assume the risk of injuries caused by the known danger of the service is one of the implied terms of the contract of service (*Piper* v. *Railroad*, 75 N. H. 228, 240; *Casey* v. *Railway*, 68 N. H. 162), and that the only duty the law imposes on a landlord for the benefit of his tenants, in so far as the leased premises are concerned, is that of not deceiving them as to the dangers incident to their use of which he does and they do not know (*Cate* v. *Blodgett*, 70 N. H. 316); but that in so far as the approaches to the premises are concerned, it is his duty to do whatever the ordinary man would do to enable them to enter and leave the premises in safety, and it is no answer to an action to show that they knew of his failure and fully appreciated the risk incident thereto. The only duty the law imposes on a landowner in so far as trespassers are concerned is that of not doing anything to injure them. The act must be both intentional and unreasonable. *Burrill* v. *Alexander*, 75 N. H. 554; *Chickering* v. *Thompson*, 76 N. H. 311. But as to most of the other relations which bring persons together, it is now held to be the duty of every one, no matter how the relation is created, to do what the ordinary man would have done in his situation. If he assumes to act, his conduct must be reasonable. *Huskie* v. *Griffin*, 75 N. H. 345.

Although it is not true in this state, as it is in England, that when the court changed its view of the master's duty it began to permit servants who were injured by the known defects in their master's instrumentalities to recover (*Williams* v. *Company*, [1899] 2 Q. B. 338), still the cases in which the doctrine of assumed risk has been

elaborated have no tendency to sustain the defendants' contention that passengers who are injured by a carrier's failure to perform a duty the law imposes on him for their benefit cannot recover if they knew of his failure and voluntarily encountered the risk incident thereto; for as has already appeared, the reason the court refuses to permit servants who are injured by a known danger to recover is either that the master owes them no duty as to such dangers (*Goodale* v. *York*, 74 N. H. 454, 456), or that "assumption of risk is purely a matter of contract." *Olney* v. *Railroad*, 71 N. H. 427, 431; *Casey* v. *Railway*, 68 N. H. 162; *Bancroft* v. *Railroad*, 67 N. H. 466; *Foss* v. *Baker*, 62 N. H. 247; *Nash* v. *Company*, 62 N. H. 406; *Fifield* v. *Railroad*, 42 N. H. 225.

It may be true, as the defendants contend, that the maxim *volenti non fit injuria* is a rule of the common law; as to that question no opinion is intended to be expressed. But even if it is a rule of the common law, it has no tendency to sustain their contention; for a person is not *volens* as to an injury he sustains unless he procured, or at least consented to, the doing of the act of which he complains. Broom Leg. Max. 268; Web. New Int. Dict., *volenti* etc.; 1 Labatt M. & S., cc. 20, 21. It is not enough that he knew of the act and fully appreciated the risk incident thereto (*Smith* v. *Baker*, [1891] A. C. 325), for *volens* means wishing, not willing; and it by no means follows from the fact that a person is willing to chance being injured, that he wishes, or even is willing, to be injured.

If, therefore, the maxim is a rule of the common law, the test to determine whether the plaintiff is *volens* is to inquire whether he consented to or procured the defendants' failure to do what the ordinary man would have done to prevent his jumping from the train when and as he did, and not, as they contend, whether he voluntarily encountered the danger he knew was incident to jumping from the train; for as will appear later, it can be found that that was their duty, and that if they had performed it the accident would not have happened. Consequently it must be assumed for the purpose of this discussion that their failure to perform that duty was either the cause or one of the causes of the accident, depending on whether the plaintiff was or was not in fault; for a wrongful act is the cause of an accident when it is either the last or one of the last acts in the series of events which resulted in the accident, or the last or one of the last acts but for which the accident would not have happened. In this case the evidence all tends to the conclusion that the plaintiff did not know the defendants owed him that duty.

Therefore it cannot be found, much less said, that he either consented to or procured their failure to perform it.

Although the cases in which this maxim has been applied tend to the conclusion that a person can relieve himself by contract from the consequences of his misconduct (*Smith* v. *Baker*, [1891] A. C. 325), and that the fact the plaintiff remained in the service after he knew of the defect of which he complains may imply a contract on his part to assume the risk of his injury (*O'Malley* v. *Company*, 158 Mass. 135), they have no tendency to sustain the defendants' contention that the facts that a person knows of a danger and voluntarily encounters it relieves those responsible for the dangerous situation of a consequence that would otherwise result from their negligence.

The mere fact that the court has held in a large number of cases in which the parties were not master and servant that the plaintiffs could not recover has no great tendency to sustain the defendants' contention, notwithstanding the plaintiffs were injured while voluntarily encountering a known danger. The weight to which such cases are entitled depends on why the recovery was denied— not on the fact it was denied. An examination will show that while in a few of these cases the court held that the facts that the plaintiff knew of the danger and voluntarily encountered it were conclusive of his right to recover (*Miner* v. *Railroad*, 153 Mass. 398), most of them were decided as they were for other reasons. In some of them the court held that it could not be found the defendants had failed to perform any duty the law imposed on them for the plaintiff's benefit. *Spead* v. *Tomlinson*, 73 N. H. 46, 59; *Schiffler* v. *Railway*, 96 Wis. 141. In others, either that it could not be found the plaintiff was free from fault (*Jagger* v. *Railway*, 180 Pa. St. 436), or that it conclusively appeared he procured the doing of the act of which he complained. *Spead* v. *Tomlinson*, 73 N. H. 46. Such cases tend rather to deny than to sustain the defendants' contention; for in deciding them the court proceeded on the theory that the plaintiff could recover if it could be found that he was not and that the defendants were in fault, or if he had not procured the doing of the act which injured him. There is nothing in these cases to suggest that the facts that the plaintiff knew of the danger and voluntarily encountered it are necessarily conclusive of his right to recover. These cases, therefore, tend to the conclusion for which the plaintiff contends; that is, to the conclusion that one who is injured while voluntarily encountering a known danger can recover if he is free

from fault, and the accident would not have happened but for the defendants' failure to perform a duty the law imposed on them for his benefit.

The great weight of both authority and reason is against the defendants' contention that the fact that one is injured while voluntarily encountering a known danger is conclusive of his right to recover, even though it is not conclusive of his fault or the defendants' freedom from fault. The trend in that direction is so great, outside of the law of master and servant, that it is fair to say "once grant the duty and all agree that mere knowledge of its breach" is no bar to the plaintiff's right to recover. 20 Harv. Law Rev. 99. In fact, the only logical conclusion which can be reached, when all the cases which have considered the right of those who were injured while voluntarily encountering a known danger to recover are read together, is that the facts that they knew of the danger incident to the condition of which they complain and voluntarily encountered it are not, in and of themselves, conclusive of their right to recover, unless the danger is so great that the ordinary man would not have done what they did. In all other cases these facts are merely evidence to be considered with other relevant facts on the issue of their care. *Stearns* v. *Railroad*, 75 N. H. 40; *Wilmot* v. *Vannah*, 75 N. H. 164; *Duggan* v. *Railroad*, 74 N. H. 250; *Stevens* v. *Company*, 73 N. H. 159; *Yeaton* v. *Railroad*, 73 N. H. 285; *Hanson* v. *Railway*, 73 N. H. 395; *Thomas* v. *Harrington*, 72 N. H. 45; *Stone* v. *Railroad*, 72 N. H. 206; *Little* v. *Railroad*, 72 N. H. 502; *Gilbert* v. *Burque*, 72 N. H. 521; *Carr* v. *Electric Co.*, 70 N. H. 308; *Mitchell* v. *Railroad*, 68 N. H. 96; *Davis* v. *Railroad*, 68 N. H. 247; *Folsom* v. *Railroad*, 68 N. H. 454; 7 Am. & Eng. Enc. Law 392, 393; 29 Cyc. 518, 519, 640; 37 Cent. Dig., *tit.* Negligence, *s.* 86; 28 L. R. A. N. S. 1215, note; 27 L. R. A. N. S. 1069, note; 2 L. R. A. N. S. 954, note; 49 L. R. A. 715, note.

All, or nearly all, common-law courts hold that one who is injured in attempting to rescue others from imminent danger can recover if the ordinary man would have done what he did, no matter how imminent the danger (*Walters* v. *Company*, 12 Col. App. 145), or how keen his appreciation of the risk may have been. *Linnehan* v. *Sampson*, 126 Mass. 506; *Wilson* v. *Railroad*, 29 R. I. 146; *Eckert* v. *Railroad*, 43 N. Y. 502; *Spooner* v. *Railroad*, 115 N. Y. 22; *Gibney* v. *State*, 137 N. Y. 1; *Miller* v. *Railway*, 191 N. Y. 77; *North Pennsylvania R. R.* v. *Mahoney*, 57 Pa. St. 187; *Corbin* v. *Philadelphia*, 195 Pa. St. 461,—49 L. R. A. 715, note; *Maryland Steel Co.* v.

*Marney*, 88 Md. 482; *Norris* v. *Railroad*, 152 N. C. 505,—27 L. R. A. N. S. 1069, note; *Central R. R.* v. *Crosby*, 74 Ga. 737; *Louisville etc. R. R.* v. *Orr*, 121 Ala. 489; *Peyton* v. *Railway*, 41 La. An. 861; *Chattanooga etc. Co.* v. *Hodges*, 109 Tenn. 331; *Railroad* v. *Ridley*, 114 Tenn. 727; *Texas etc. R. R.* v. *Scarborough*, 101 Tex. 436; *Missouri etc. Ry.* v. *Goss*, 31 Tex. Civ. App. 300; *Pennsylvania Co.* v. *Langendorf*, 48 Ohio St. 316; *Pittsburg etc. Ry.* v. *Lynch*, 69 Ohio St. 123; *Pennsylvania Co.* v. *Roney*, 89 Ind. 453; *West Chicago etc. Co.* v. *Liderman*, 187 Ill. 463; *Cottrill* v. *Railway*, 47 Wis. 634; *Saylor* v. *Parsons*, 122 Ia. 679; *Becker* v. *Railroad*, 110 Ky. 474; *Murphy* v. *Railroad*, 114 Ky. 696; *Schrœder* v. *Railroad*, 108 Mo. 322; *Clark* v. *Company*, 16 Mo. App. 463; *Condiff* v. *Railroad*, 45 Kan. 256; *McCallion* v. *Railway*, 74 Kan. 785; *Bracey* v. *Company*, 41 Mont. 338; *Smith* v. *Railway*, 52 Wash. 350; *Thomason* v. *Railway*, 113 Fed. Rep. 80; *Connell* v. *Prescott*, 20 Ont. App. 49.

A majority, at least, of all the courts in this country, perhaps of all common-law courts, permit one who is injured while attempting to save property (either his own or that of others) to recover, no matter how imminent the danger, if the ordinary man would have done what he did. *Fisher* v. *Railway*, 104 Va. 635,—2 L. R. A. N. S. 954, note. All courts permit travelers who are injured by a known defect in the highway, and tenants who are injured by such a defect in a hall as the landlord is bound to repair, to recover when the ordinary man would have done what they did; and as has already appeared, servants who are injured by a known defect in their master's instrumentalities in England are, and in this state should be, permitted to recover when they are free from fault, unless the court can say or the jury finds that notifying them of the danger incident to the defect of which they complain is all the ordinary man would have done to enable them to do their work in safety. The mere fact, therefore, that the plaintiff was injured while voluntarily encountering a known danger is not, in and of itself, conclusive of his right to recover. It follows, therefore, that the court did not err when it submitted this case to the jury, if there was any evidence tending to the conclusion that the plaintiff did and the defendants failed to do what the ordinary man would have done to prevent an accident.

2. This court holds that it is a carrier's duty to do whatever the ordinary man would have done to enable his passengers to make the journey in safety. *Taylor* v. *Railway*, 48 N. H. 304. Therefore, whenever it appears that passengers do not appreciate the risk to

which their conduct exposes them, it is the carrier's duty to do what the ordinary man would do to prevent their exposing themselves to danger unnecessarily. *Wheeler* v. *Railway*, 70 N. H. 607. It can be found that the plaintiff did not appreciate the danger incident to jumping from a train moving as fast as this one was at the time he was injured, and it cannot be said all fair-minded men will agree that the ordinary man would not have known such a boy would not be likely to appreciate the danger incident to such a proceeding. It can be found, therefore, that the defendants owed the plaintiff the duty of doing what the ordinary man would have done to prevent his jumping from the train in the way he did when he was injured, and that if they had performed that duty the accident would not have happened. Consequently it can be found that the defendants' failure to perform it was either the legal cause of, or contributed to cause, his injury; and it is no answer to say that a carrier is not bound to anticipate that passengers will jump from the train when it is in motion (*Douyette* v. *Railway*, 69 N. H. 625), for the defendants knew that the plaintiff was in the habit of jumping from the train at this crossing every morning when it was not moving faster than it was at the time of the accident.

3. There is no statute or rule of the common law which provides that passengers shall not leave a train between stations. The test, therefore, to determine whether the plaintiff was acting within his legal rights when he jumped from this train is to inquire whether the ordinary boy of his age and experience, and with his knowledge of the situation and its dangers, would have done what he did; in other words, to inquire whether he was free from fault. *Goodale* v. *York*, 74 N. H. 454.

It does not necessarily follow from the fact that the ordinary man would not have jumped from the train in the way and at the time the plaintiff did, if he had no more cause for doing it than the plaintiff is shown to have had (*Douyette* v. *Railway*, 69 N. H. 625), that it can be said the plaintiff was guilty of contributory negligence as a matter of law, for he was a mere child with but little experience in riding on the railroad. The danger of falling under a moving car was not obvious to such a boy, and he was merely doing what he knew his associates, who had been riding for years, were in the habit of doing. Further than that, none of the men in charge of the train during the few weeks the plaintiff had been riding ever suggested to him that jumping off at the crossing as he was in the habit of doing was dangerous. It cannot be said that under these

circumstances the ordinary boy of his age and experience, and with his knowledge of the situation and its dangers, would not have done what he did.

4. The defendants base their contention in respect to the remarks of the plaintiff's counsel on the proposition that it is error for counsel to state as a fact a matter that may fairly be inferred from the evidence, but as to which there is no direct testimony. That, however, is not the law. The test to determine the legality of such a statement is to inquire whether counsel was arguing or testifying when it made it. *Walker* v. *Railroad*, 71 N. H. 271; *Story* v. *Railroad*, 70 N. H. 364, 375; *Mitchell* v. *Railroad*, 68 N. H. 96, 117. When it can be found, either from the statement itself or the circumstances under which it was made, that counsel was testifying, the verdict will be set aside unless he procures a finding that he was merely asking the jury to find that that was what the evidence tended to prove; but in this case everything points to the conclusion that that was what counsel was doing when he made the statement excepted to. *Fellows* v. *Company*, 76 N. H. 457.

*Defendants' exceptions overruled.*

PARSONS, C. J., and WALKER, J., concurred in the result: the others concurred.