Coös,
Sept. 6, 1932.

WILFRED VIDAL, *Adm'r v.* ERROL.

2

*Matthew J. Ryan* and *Crawford D. Hening* (by brief and orally), for the plaintiff.

*Edmund Sullivan* and *Shurtleff & Hinkley* (*Mr. Hinkley* and *Mr. Sullivan* orally), for the defendant.

BRANCH, J.   The plaintiff's intestate met her death upon May 30, 1929, when the automobile in which she was riding was driven over the

edge of an embankment alongside a highway in the town of Errol, and rolled into the Androscoggin river. The embankment which was "pretty steep" with a drop of six or eight feet to the river, was unrailed at the point of accident, and the absence of a railing was the defect of which the plaintiff complained. The accident happened late at night and a heavy fog prevailed at the time. There were five persons in the car, three young men and two girls, one of whom was the deceased. The car was driven by one Biron who did not then hold an operator's license, and this fact raises the most important question of law presented by the record.

I. The defendant takes the position that the plaintiff is barred from recovery because the driver of the car was not licensed. It is said that this conclusion is a necessary corollary of our decision in the case of *Johnson* v. *Railroad*, 83 N. H. 350, in which it was held that the statute (P. L., c. 101, s. 8) makes unlicensed driving a civil wrong which, if causal, bars recovery by one so driving for injuries negligently inflicted upon him. It is argued that the logic of the *Johnson* case leads to the conclusion that the object of the statute is "to keep from the highways cars operated by unlicensed drivers. In effect it is the car so operated that is outlawed, just as in Massachusetts, Maine and Vermont it is the car unregistered that is barred." We are, therefore, urged to hold in accordance with the decisions in those jurisdictions (*Dudley* v. *Railway*, 202 Mass. 443; *Feeley* v. *Melrose*, 205 Mass. 329; *McCarthy* v. *Leeds*, 116 Maine 275; *Hanley* v. *Poultney*, 100 Vt. 172) that in New Hampshire a car is barred from the highways when "used in a manner contrary to the statute" and that a town "owes no duty to the occupants of such a proscribed vehicle. They are not travelers but trespassers."

This argument is without merit. The reasoning of the *Johnson* case furnishes no basis for the conclusion that a motor vehicle, as such, under any circumstances becomes an outlaw or a trespasser upon the highways of this state, and in the case of *Clark* v. *Hampton*, 83 N. H. 524, we explicitly declined to adopt the rule which prevails in the jurisdictions above referred to. In the course of that decision we stated our view of the Massachusetts rule as follows: "It seems to us that the Massachusetts cases put the whole subject in an illogical and unreasonable situation. Except in very unusual circumstances the inanimate car is incapable of doing harm. Accidents happen because of the way in which the driver causes the car to move. It is the act of the sentient operator, and not the mechanical response of the operated car, which constitutes the danger

to be guarded against." *Clark* v. *Hampton, supra* 528-530. We still adhere to the ideas thus expressed. The protective features of our statute have to do only with the acts of sentient operators and not at all with the mere presence of inanimate cars upon the highways of this state. The argument of the defendant that the plaintiff cannot recover because the vehicle in which the deceased was riding had been proscribed must therefore be rejected.

The question whether upon any other theory the conduct of the deceased in riding with an unlicensed driver precludes a recovery by her administrator remains to be considered. The fundamental idea underlying all the arguments which have been advanced in favor of an affirmative answer to this question is that the deceased stood in no better position than the driver himself, and since the statute, as construed in the *Johnson* case would have precluded a recovery by him if he had been injured in the accident, the plaintiff should be, for similar reasons, denied a recovery here. It is thus asserted that the deceased shared the legal disabilities of her driver and hence it is essential that the nature and extent of those disabilities be clearly understood.

In *Johnson* v. *Railroad, supra,* the plaintiff failed to recover because his illegal act of driving without a license was, in part, the cause of his injury. The case merely involved an application of the general rule that "If injury results to one while engaged in an act which is a violation of law, and the doing of the prohibited act contributes to the injury, no recovery can be had" (1 Cooley, Torts (4th *ed.*), s. 90), and the point of the decision was that "the act of driving a motor vehicle by an unlicensed person, if causal, is a private wrong rendering the driver accountable for damage caused thereby." *L'Esperance* v. *Sherburne,* 85 N. H. 103, 107. Nowhere in the *Johnson* case is there a suggestion that the unlicensed driver is an outlaw upon the highway or that the legal duty of others to avoid injuring him was abrogated or modified by the statute. To assert that these results follow from the *Johnson* case involves a misconception of the scope of that decision and a disregard of the normal rule with reference to the consequences of the violation of a penal statute. "The fact that a person injured was at the time violating the law, does not put him out of protection of the law; he is never put by the law at the mercy of others." 1 Cooley, Torts (4th *ed.*) s. 92. The extent of the plaintiff's right to protection was not the point at issue in the *Johnson* case, nor is it at issue here. We are at this time concerned solely with the legal effect of her conduct and not at all with the extent of the defendant's duty.

Unless the law positively enjoins upon one the duty to do or omit to do a particular act, conduct under a given set of circumstances presents only a question of due care with reference to the danger of personal injury. *Fisher* v. *Railway*, 177 Ia. 406. Therefore, if the plaintiff is to be denied a recovery under the principle of the *Johnson* case, it must be because she was engaged in an act prohibited by law and the doing of the prohibited act contributed to cause her injury. The question then resolves itself into this, was the deceased, while riding with Biron, engaged in an act which was a violation of law?

It should be noted in the first place that there is nothing in the language of the statute to indicate that such conduct was forbidden. We search the motor vehicle law in vain for any indication of a legislative purpose that the passengers in a car driven by an unlicensed driver should be classed as wrongdoers, and for that reason denied a recovery for injuries negligently inflicted upon them by others. The gross injustice of such a result in the case of small children, (see *McCarthy* v. *Leeds*, 116 Maine 275) indicates the improbability that the legislature entertained any such purpose. The same may be said of the injustice, only slightly less in degree, of imposing such a disability upon a passenger ignorant of the driver's unlicensed status. The force of these considerations has been recognized in Massachusetts where the legislature has intervened to mitigate the harshness of the rule that the passengers in an unregistered car are without remedy for injuries negligently inflicted upon them, and has provided that the rule shall not apply to passengers who are not chargeable with knowledge that the statute has been violated. Mass. St. 1915, *c.* 87.

There is no provision of our statute, however, which makes decisive the question of the passenger's knowledge, nor do we regard it as material in this connection. So far as the language of the act is concerned, passengers with knowledge stand in no worse position than those without it. The legislature did not manifest any intention with reference to either class.

The purpose of the provision which forbids unlicensed driving is the protection of the public from the acts of incompetent drivers. The unlicensed driver is classed as unfit and denied the use of the highway "because he has not taken the prescribed method to establish his fitness in advance." This "is a reasonable preventive and remedial measure." *Johnson* v. *Railroad, supra,* 360, 361. The last statement could hardly be made with reference to a provision that passengers should share the disabilities of the driver. Its tendency to reduce or prevent incompetent driving would be hardly discernible. For

this reason clear evidence of a legislative purpose to establish the rule should be required before according recognition to a principle of such doubtful utility. There is no such evidence in the statute before us. By the final clause of the section upon which the defendant puts its chief reliance, however, the legislature did class with unlicensed drivers owners who permit their cars to be operated by unlicensed operators. "No person shall operate a motor vehicle upon any way in this state unless licensed under the provisions of this title, *or permit such a vehicle owned or controlled by him to be so operated by a person not so licensed, except as otherwise herein provided.*" P. L., c. 101, s. 9. It seems clear that by virtue of this provision the owner of a motor vehicle who permitted it to be operated by an unlicensed driver would be subject to civil liability for the illegal conduct of the operator.

Accepted canons of statutory construction point to the conclusion that the expression of this limited purpose precludes the inference that the legislature intended the statute to have the broader effect of determining the rights of other persons not referred to therein.

"Here, as always, the question of interpretation is one of finding the legislative intent. The imposition of civil liability extends no further than the legislature intended." *L'Esperance* v. *Sherburne*, 85 N. H. 103, 108. Biron's act in driving without a license would not "have been a legal fault, *per se*, but for the legislative declaration making it so." *Johnson* v. *Railroad*, *supra*, 361. By the same token, the act of the deceased in riding with him cannot be regarded as a legal fault in the absence of a legislative declaration making it so.

The theory has been advanced, however, that the conduct of the deceased was illegal because some rule of common law, plus the statute, made it so, and four doctrines of the common law have been suggested as furnishing a possible basis for this conclusion, which for purposes of brevity may be given the following labels, and will be considered in the order stated. 1. Assumption of risk. 2. Joint enterprise. 3. Ratification. 4. Joint wrongdoers.

1. The suggestion that the plaintiff is barred from recovery because the deceased, by riding with an unlicensed driver, assumed the risk of any harm which might result from his conduct, requires only brief consideration. Even if the deceased were chargeable with knowledge of the fact that Biron had no license, a point hereinafter more fully discussed, and if she had realized that there was some danger involved in riding with him, the doctrine of assumption of risk would not preclude recovery in this case. It is now well settled in this state that, outside the relation of master and servant, the fact that one is

injured while voluntarily encountering a known danger created by another is not conclusive of his right to recover. *Kambour* v. *Railroad*, 77 N. H. 33, 49. Unless the conduct of the injured party in exposing himself to danger is negligent, the fact that he knowingly encountered it is indecisive. The conclusion that voluntary exposure to a known danger is merely a form of contributory fault is believed to be in accord with the trend of contemporary legal development. See Bohlen, Studies in the Law of Torts, 520. The question of the decedent's due care is dealt with in section III of this opinion.

Furthermore, the doctrine of assumed risk is everywhere subject to the limitation that it does not bar recovery for damages suffered as the result of encountering a hazard of which the injured party had knowledge and another of which he was ignorant. *Kruger* v. *Company*, 84 N. H. 290, 295 and authorities cited. The evidence in this case would sustain a finding that the negligence of the town was in part, at least, the cause of the accident, and it is, therefore, plain that the plaintiff cannot be denied a recovery, as a matter of law, upon the ground that the deceased assumed the risk of her driver's misconduct.

2. The argument that the decedent was engaged in a joint enterprise with the driver and that she was, therefore, charged with responsibility for his illegal conduct, will not bear examination. The only conclusion of which the evidence will permit is that the deceased was a guest of the owner of the car, who also lost his life in the accident, and at whose request Biron undertook to drive. There is no suggestion in the testimony that she had any right to control the management of the car, "and that right is here the test of responsibility for acts. *Noyes* v. *Boscawen*, 64 N. H. 361. There must be not only a joint interest in the objects or purposes of the enterprise, but also 'an equal right to direct and govern the movements and conduct of each other with respect thereto'." *Bowley* v. *Duca*, 80 N. H. 548, 549; *Clark* v. *Hampton*, 83 N. H. 524. The joint enterprise theory does not fit the facts of the present case.

3. It seems to be established law that one may subject himself to legal liability for the tortious acts of another by ratification, (*Dempsey* v. *Chambers*, 154 Mass. 330; *Brainerd* v. *Dunning*, 30 N. Y. 211) but this is a rule of somewhat narrow application, since "the meaning of ratification is, and always has been, the adoption of an act purporting to be done, or, at least, done in fact, on behalf of the ratifier." *Holmes, J.*, in *New England &c. Company* v. *Company*, 149 Mass. 381, 382. The requirement of the early law was that the act should have been "done in the name of the ratifying party" (*Dempsey* v. *Cham-*

bers, supra) and it is still undoubted law that the only person who can ratify the act of another is the purported principal on whose behalf the act was performed. Am. Law Inst. Restatement of Agency, Tent. Draft No. 1, ss. 86, 118. For the history of the rule as applied to torts, see the opinion of *Holmes, J.,* in *Dempsey* v. *Chambers, supra.*

The mere statement of the rule demonstrates its inapplicability to the present case. It is absurd to suggest as a fact that in driving the car Biron acted as an agent on behalf of the deceased as his purported principal, and as a matter of law it is well settled that the driver of a vehicle is not the agent or servant of one who is merely a passenger therein. *Noyes* v. *Boscawen,* 64 N. H. 361; *Hanson* v. *Railway,* 73 N. H. 395; *The Bernina,* L. R., 12 Prob. Div. 28.

The true limits of the principle of ratification have not always been observed, however, and much confusing language is to be found in the books. Thus in *Judson* v. *Cook,* 11 Barb. 642, 644, we find the following statement, which was quoted with apparent approval in *Moir* v. *Hopkins,* 16 Ill. 313, and has found its way into legal treatises (38 Cyc: tit. Torts, 485), "All who aid, command, advise or countenance the commission of a tort by another, or who approve of it after it is done, if done for their benefit, are liable in the same manner as they would be if they had done the same tort with their own hands." Language of similar import is to be found in the case of *Wamsganz* v. *Wolff,* 86 Mo. App. 205.

The case in which the above principle was laid down was an action in the nature of trover against the president of a bank, in which he was held personally responsible for the unlawful acts of a deputy sheriff committed while levying an execution in favor of the bank. It might easily have been disposed of under the accepted principles of torts with reference to joint wrongdoers which are hereinafter stated. The learned judge (*Shankland,* J.) apparently had in mind, however, some inexact notion in regard to ratification and hence announced the above rule of law, which is equally indefensible as a principle of agency or torts. The authorities cited in its support are as follows: *Guille* v. *Swan,* 19 Johns. 381; *Bishop* v. *Ely,* 9 *Id.* 294; *Morgan* v. *Varick,* 8 Wend. 587; *Coats* v. *Darby,* 2 Comst. 517; 1 Chit. Pl. 67 (16th Am. ed. *90). In none of these authorities can sanction be found for the use of the vague word "countenance" or the singularly erroneous phrase "approve of it after it is done"; but the words "if done for their benefit" are perhaps the most misleading ones in the above quotation. It may be supposed that they were designed to express a requirement that an act to be ratifiable must have been

done on behalf of the ratifying party, but they imperfectly serve this purpose, and tend rather to suggest the idea that a benefit in fact received from the wrongful act of another, plus some vague approval or countenancing of it by the person benefited, is sufficient to impose liability therefor. This is not the law. Mere approval of the tortious act of another after it is done will not charge one with liability as a wrongdoer even though the act was in fact done for his benefit. *Wilson* v. *Tumman*, 6 Man. & Gr. 236; *Hyde* v. *Cooper*, 26 Vt. 552; and *a fortiori* approval plus some benefit incidentally received will not impose such vicarious liability. 1 Cooley, Torts, s. 76. The correct legal formula for the establishment of tort liability by ratification has thus been stated. "A tortious act done for another, by a person not assuming to act for himself, but for such other person, though without any precedent authority whatever, becomes the act of the principal if subsequently ratified by him, and, whether it be for his detriment or his advantage, to the same extent as if the same act had been done by his previous authority." Underhill, Torts (2d Canadian *ed.*) Art. 19. We shall again refer to the subject of benefits received from the act of another in connection with the next topic herein considered.

4. A modern statement of the rule which makes joint wrongdoers liable jointly and severally for the results of their tortious conduct is to be found in the case of *Williams* v. *Company*, 176 N. C. 174, 178, as follows: "When two or more are engaged in an unlawful enterprise which causes damage to another, each is individually responsible for all injuries committed in its prosecution, and this although the specific injury was done by one of the parties alone, the liability of the other being founded upon the concert of action."

If the deceased came within this rule, it would seem to follow not only that plaintiff's suit must fail, but that the deceased or anyone in her position would be liable for any damage caused by the acts of the unlicensed driver. An application of the established tests for determining who are joint wrongdoers demonstrates, however, that the deceased did not come within that category.

In this connection, as Cooley points out, it is important to observe the distinction between intentional and unintentional wrongs, "inasmuch as the existence of wrongful intent is, in many cases, of highest importance." 1 Cooley, Torts, (4th *ed.*) s. 80. With reference to unintentional wrongs, the same author says that no general rule can be laid down for the purpose of determining who are joint tortfeasors (*Ib.*, s. 86), but when a single injury results from the negligent conduct of two or more parties, justice and convenience are served

by permitting joint actions against them, and by the rule making each severally liable for all the damages which result.

This somewhat loose general rule has no application to a case like the present, where the plaintiff is charged with participation in the breach of a criminal statute. With reference to such a charge, legal significance can be attached only to action which was voluntarily taken with knowledge of the facts which rendered it illegal. Only upon a showing of intentional wrong committed jointly by the deceased and Biron can the defendant hope to succeed in this case. Unless she knew that Biron was unlicensed, no finding that she committed an intentional wrong could be sustained. Upon this point we have no hesitation in holding that the principle embraced in the Massachusetts statute of 1915, above referred to, prevails here as a rule of common law.

At this point the plaintiff was entitled to rely upon the presumption that persons traveling upon a highway are lawfully there. "If there was no proof of a violation of the law by him [a traveler], he must be presumed to have been innocent thereof and to have been using the way lawfully." *Conroy* v. *Mather*, 217 Mass. 91, 95; *Doherty* v. *Ayer*, 197 Mass. 241. As applied to the case at bar, the presumption has a sound basis in common knowledge that the vast majority of automobile drivers are legally licensed. It was, therefore, no part of the plaintiff's case to produce evidence that the driver was licensed, (*Shaw* v. *Thielbahr*, 82 N. J. L. 23), or that the decedent was ignorant of his unlicensed status. Clearly the burden of going forward with evidence that she knew the facts rested upon the defendant (2 Chamb., Ev. ss. 1219-1223), although the ultimate burden of convincing the jury upon this issue remained with the plaintiff. In Massachusetts and Maine the courts have gone further and hold that in cases of accidents upon highways the full burden of proving that the statutory provisions in regard to registration and licensing have not been complied with by a plaintiff rests upon the defendant. *Conroy* v. *Mather*, 217 Mass. 91; *Feeley* v. *Melrose*, 205 Mass. 329; *Dean* v. *Railway*, 217 Mass. 495; *Walsh* v. *Company*, 270 Mass. 296; *Balian* v. *Ogassian*, 277 Mass. 525; *Lyons* v. *Jordan*, 117 Me. 117.

Even if there were evidence which would sustain a finding that the deceased knew that Biron had no license, the plaintiff could not be nonsuited upon any theory involving the establishment of that fact unless the evidence were conclusive or the fact admitted. Ordinarily the question would be for the jury. The present record, however, discloses no evidence from which it could be found that the deceased

had knowledge of that fact. The only reference to the matter is found in the testimony of Biron himself. In answer to the question, "Did you ever tell Leo Banville or anybody in that party whether you had a license or not?" he replied, "There was no question—never any question of license." His testimony then continued as follows: "Q. What, exactly, do you mean by your answer? A. I mean to say that they never asked me if I had a license and I did not speak to them about it. Q. At any time before this accident had you had any talk with Leo Banville or Miss Vidal as to whether or not you had a license? A. I do not remember. Q. Or with Miss Vidal? A. No, he says he don't remember."

The net effect of this testimony was that on the night of the accident he did not tell the deceased that he had no license, and he was unable to state that he ever talked with her at any other time about the matter. The inadequacy of this testimony to support a finding that she knew the true situation seems obvious, and this branch of the case as at present presented might well be disposed of upon the ground that this lack of proof precluded a finding that the deceased was a wrongdoer. Inasmuch, however, as additional evidence of the decedent's knowledge may be presented at another trial, the further requisites of a joint liability for wrongful acts have been considered.

With reference to intentional wrongs like trespass and deceit, many other considerations beside that of responsibility for damages apply, and definite tests for determining who are joint tortfeasors have been established, by which it has long been settled that there can be no joint liability unless there was personal coöperation in the wrongful act. "To charge one with participation in a wrong, it is generally essential that he should have contributed to it personally; but this, as has already been shown, may have been by advising or procuring it to be done, when he did not otherwise take part in it." 1 Cooley, Torts, (4th *ed.*) *s.* 75. The phrase most frequently used to indicate this requirement of personal coöperation is "concert of action." Thus in *Moore* v. *Fryman*, 154 Ia. 534, 537, which was a case of deceit, we read, "It is undoubtedly true that a joint recovery can not be had against tort-feasors, where there is no concert of action or common intent, and their acts are separate as to time and place. But the rule is also well settled that joint liability does exist where the wrong is done by concert of action and common intent and purpose, and that there may be such concurrent action and cooperation as will create joint liability without proof of a conspiracy."

In many of the older cases of trespass, this requirement of personal

participation is plainly stated. Thus in *Guille* v. *Swan*, 19 Johns. 381 (1822) it is said, "Where an immediate act is done by the co-operation, or the joint act of several persons, they are all trespassers, and may be sued jointly or severally; and any one of them is liable for the injury done by all. To render one man liable in trespass for the acts of others, it must appear, either that they acted in concert, or that the act of the individual sought to be charged, ordinarily and naturally, produced the acts of the others." To the same effect are *Williams* v. *Sheldon*, 10 Wend. 654; *Bard* v. *Yohn*, 26 Pa. St. 482; *Little Schuylkill &c. Co.* v. *Richards*, 57 Pa. St. 142; *Berry* v. *Fletcher*, 1 Dill. 67; *Hilmes* v. *Stroebel*, 59 Wis. 74; *Brown* v. *Perkins*, 1 Allen 89.

In *VanSteenburgh* v. *Tobias*, 17 Wend. 562 (1837), which was a joint action of trespass against several owners of dogs for killing sheep, we find the following significant comment by *Cowen*, J.: "The reason which makes one liable who personally joins in, or aids or abets the wrong done by another, does not apply. That is a case of intention or volition in the offender; and the man who advises or countenances a trespass is the real cause. ... This is the same principle which inculpates the rioter or conspirator; and makes him, though absent, a party to all that the actual perpetrator may say or do. In this there is great formal fitness and propriety; for there is actual delinquency."

In some of these cases a rather obvious corollary of the principle under discussion is stated, *i.e.* that mere physical presence when a trespass is being committed will not be enough to charge one with joint liability. Participation of some sort must be shown. *Hilmes* v. *Stroebel*, *supra*.

The principle of the foregoing cases was recognized and applied without extended discussion in the cases of *Russell* v. *Fabyan*, 34 N. H. 218, 226, and *Gibbs* v. *Randlett*, 58 N. H. 407.

Judged by the foregoing standards, it cannot be found that the deceased and Biron were joint wrongdoers. Biron's illegal conduct consisted in the operation of a motor vehicle without a license. There is no suggestion in the evidence that the deceased had anything to do with the physical management of the car or that she exercised control over it in any other way. There is no evidence that she asked, advised or suggested that Biron take the wheel. There is no basis even for a finding that she consciously consented to his doing so. The evidence discloses nothing more than passive acquiescence on her part in the management of the car by the male members of the party. To use Judge *Cowen's* phrase, it does not appear that she manifested

any "intention or volition" in the matter. She was hardly more culpable than an innocent by-stander who witnesses the commission of a trespass. No concert of action or community of purpose between her and Biron were shown to exist.

Her position was plainly less equivocal than that of the defendant in the case of *Hubbard* v. *Hunt*, 41 Vt. 376. The point of that decision, as stated in the head note, is as follows: "A rode with B from Barton to Newport, knowing that B had hired the team to go only to Barton, but exercised no control over it. *Held*, that A was not liable as a trespasser to the bailor of the team." In the opinion we read, "The words in the charge, 'If the defendant merely rode from Barton, by invitation of said Quimby, and exercised no control over the team, he would not be liable'; cover the whole ground."

This case furnishes a definite answer to the suggestion that if the deceased, with knowledge that Biron had no license, accepted the benefit of his acts by riding with him she became a participant in his illegal conduct. According to the Vermont decision, the soundness of which does not appear to have been questioned, the mere acceptance of benefits from the wrongful conduct of another, by one who has full knowledge of its wrongful character, is not sufficient to charge the latter with responsibility for such conduct as a joint wrongdoer. The instruction approved by the court which made liability dependent upon the exercise of control over the team constituted a specific application of the principle set forth above, *i.e.* that there must be some actual personal participation in the wrongful act itself—some manifestation of intention or volition in the matter—before one can be charged as a joint wrongdoer. An act, legal or illegal, and its consequences are or may be entirely separate and distinct conceptions. Participation in an act may render all the actors liable for the consequences, but voluntary acceptance of the consequences of another's act is not the equivalent of joint action.

We, therefore, conclude that the deceased cannot be classed as a wrongdoer by reason of the fact that she was riding with an unlicensed driver and hence the plaintiff cannot be denied a recovery merely because the driver was not licensed.

II. The defendant also takes the position that "there was no evidence that a standard railing would have prevented the accident," and accordingly argues that this case is governed by the principle which was stated and applied in *Cozzi* v. *Hooksett*, 84 N. H. 530. That case is clearly distinguishable from the one at bar. Here the sufficiency of the railing as a barrier to stop a moving car was not the de-

cisive issue. The claim rather was that a proper railing would have acted as a marker defining the edge of the road and a guide by which the driver could have governed the course of the car and thus avoided the accident. It is well understood that one of the functions of a railing is to give notice of danger in this way, (*Kelsea* v. *Stratford*, 80 N. H. 148, 149) and there was evidence that the driver had guided himself by the fences wherever they existed. Under these circumstances a finding that a standard railing would have prevented the accident would be sustainable.

III. The issue of contributory negligence on the part of the deceased was for the jury, and upon this issue her knowledge or lack of knowledge as to the unlicensed status of the driver was a material fact. It may be thought that this conclusion runs counter to the holding in the case of *Johnson* v. *Railroad, supra,* that a violation of the statute cannot be regarded merely as evidence of the driver's negligence, but the situation here is different. Inferences of fact are usually to be drawn from the unlicensed state. The party is probably inexperienced and incompetent. These are considerations which bear upon the care of the passenger. If he knew that the driver was a careful person with years of experience, the fact that his license had not been renewed for the current year would be colorless upon the issue of the plaintiff's care, but in regard to a person who has never had a license, inferences as above suggested at once arise. These inferences varying in force with the facts of the particular case may give rise to a conclusion that it was negligent to ride with such a driver.

The burden of proof upon this issue, however, rested upon the defendant (P. L., *c.* 328, *s.* 13), and as we have already pointed out, the evidence before us would not justify a finding that the deceased knew that Biron had no license.

If, upon a new trial, this fact were established, it would still be for the jury to say whether under all the circumstances she was negligent in riding with him. The same may be said of the defendant's contention that Biron had been drinking. How much liquor, if any, he had consumed, what its effect upon him was and how much Miss Vidal knew about these things were all matters for the jury to pass upon.

The question how well or how badly Biron drove the car was one of the controversial points of the trial, but whatever may be thought of his conduct in driving on the left hand side of the road and attempting to follow the line of the tarvia surface at the point of the accident, it is plain that his negligence, if established, cannot be imputed to the

deceased. *Hoen* v. *Haines*, 85 N. H. 36, 39; *Hanson* v. *Railway*, 73 N. H. 395, 398; *Noyes* v. *Boscawen*, 64 N. H. 361. Neither can it be said as a matter of law that the deceased should have appreciated the danger which his conduct involved and taken measures for her protection. How much knowledge she had as to their exact position on the road and the proximity of the river is by no means conclusively established by the testimony.

IV. The trial court refused to permit a doctor called as a witness by the plaintiff to testify "how the lights [of an automobile] act in a fog," and the plaintiff excepted. The apparent ground of this ruling was indicated by the following question put by the court to plaintiff's counsel. "Do you think he knows anything more about it than the jury?" No ground for reversing a discretionary ruling of this kind has been suggested by counsel and none occurs to us. This exception must be overruled.

Plaintiff's other exception to the exclusion of evidence was not argued and is understood to be waived.

None of the grounds upon which it is sought to sustain the nonsuit being tenable, the order here must be

*New trial.*

All concurred.