Strafford
No. 2001-457

CAROL AND GARY ALLEN

v.

DOVER CO-RECREATIONAL SOFTBALL LEAGUE *& a.*

Submitted: July 26, 2002
Opinion Issued: September 30, 2002

408

*McDowell & Osburn, P.A.*, of Manchester (*Joseph F. McDowell, III* and *Mark D. Morrissette* on the brief), for the plaintiffs.

*Backus, Meyer, Solomon, Rood & Branch, LLP*, of Manchester (*Erica Bodwell* and *Robert A. Backus* on the brief), for defendants Dover Co-Recreational Softball League, Amateur Softball Association of America, Daniel's Sports Bar and Grill, Thompson Imports, and Martel-Roberge American Legion Post #47.

*Upton & Hatfield, LLP*, of Concord, for defendant Bollinger Fowler Company, joins the brief submitted by the other defendants.

DUGGAN, J. The plaintiffs, Carol and Gary Allen, appeal a Superior Court (*T. Nadeau*, J.) order dismissing all counts of their negligence action seeking recovery for injuries suffered when Carol Allen was hit in the head by an errantly thrown softball. We affirm.

The plaintiffs allege the following facts. On September 13, 1998, Carol Allen was injured while participating in a recreational softball game when an errantly thrown softball struck her in the head as she ran to first base. The game was part of an adult, co-recreational, slow-pitch softball tournament.

The defendants are all organizations associated with the softball tournament. The teams playing in the tournament were part of defendant

Dover Co-Recreational Softball League (league), which is sponsored by defendant Amateur Softball Association, Inc. (ASA). The ASA promulgates rules that govern the play of its member leagues. The teams playing in this particular game were sponsored by defendant Daniel's Sports Bar and Grill (Daniel's) and defendant Thompson Imports (Thompson). Team sponsors provided t-shirts for the players. The game was played on a field owned by defendant Martel-Roberge American Legion Post #47 (American Legion). Defendant Bollinger Fowler Company (Bollinger) provided liability insurance coverage for the league, ASA, the American Legion, the Daniel's team and the Thompson team.

On the day the plaintiff was injured, she was playing for the Daniel's team in a one-pitch tournament. As set forth in ASA official rules, the softball used when women batted was smaller than the softball used when men batted. This use of different balls is intended to allow the women to hit more competitively with the men. The defendants did not recommend, require or provide helmets for players. Although a slow-pitch game under the ASA official rules is played with five men and five women for each team, the game on September 13 was played with seven men and three women on each team.

When batting for the first time on September 13, Carol Allen hit a ball toward shortstop. A male player for the Thompson team fielded the ball and threw it toward first base. His throw, however, was inaccurate and struck Carol Allen in the head. As a result, she suffered head and brain injuries that caused cognitive deficiencies including impaired speech. At the time of the injury, the plaintiffs allege the smaller ball was used and Carol Allen was not wearing a helmet.

The plaintiffs subsequently filed a writ alleging several counts of negligence. First, the plaintiffs allege that the league and Daniel's acted negligently when they conducted the softball game "without utilizing all reasonable safety precautions including but not limited to recommending, requiring, or providing batting helmets for the players, using less dangerous softballs, and maintaining proper male/female player ratios." The plaintiffs further allege that ASA breached its duty to promulgate and enforce rules that required batting helmets to be worn in softball games, use of a less dangerous softball and each team to play with five men and five women, and to otherwise minimize the risk of injury to participants in co-recreational softball games. The plaintiffs also allege that ASA "had a duty to warn, advise, inform and instruct its members regarding the risk of injury to participants in co-recreational softball games and the manner in which such risks could be minimized." As for the American Legion, the plaintiffs claim that as the owner of the softball field, it "had a duty to

require that softball games played on its field were played pursuant to rules and in a manner which minimized the risk of injury to participants." The plaintiffs further allege that Thompson "is vicariously liable for the negligence of its shortstop in errantly throwing the softball." Finally, the plaintiffs allege that because Bollinger provided risk management services to its insureds—the league, ASA, the American Legion, the Daniel's team and the Thompson team—"Bollinger had a duty to warn, advise, inform, and instruct its insureds regarding the risk of injury to participants in co-recreational softball games and the manner in which such risks could be minimized."

All of the defendants moved to dismiss the case arguing, among other things, that they owed no duty to protect Carol Allen from the inherent risks of injury that arose out of her participation in the softball game. In their objection, the plaintiffs argued that "[t]he sole basis for the Defendants' motion to dismiss is the doctrine of primary assumption of the risk." The plaintiffs maintained that the doctrine of primary assumption of the risk has been rejected by this court, and therefore "participants in recreational activities do not assume the risks inherent in the sport." They argued the "appropriate analysis to determine whether or not the Plaintiffs are entitled to recovery should be governed solely by the comparative fault statute, R.S.A. 507:7-d."

In its order, the trial court first considered whether the plaintiffs' allegation that Thompson is vicariously liable for the negligence of its shortstop stated a claim upon which relief may be granted. The court ruled that participants do not owe a duty to other participants to refrain from "injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation" but rather participants "in recreational sporting events owe a duty to other participants to refrain from reckless or intentional conduct [that may injure the other participants]." Because the plaintiffs alleged that Thompson's shortstop acted negligently, not recklessly or intentionally, when he errantly threw the ball, the court concluded, "Thompson Imports cannot be held vicariously liable under the circumstances of this case."

The trial court then examined the plaintiffs' allegations that the remaining defendants were negligent for various failures to take measures that would reduce the risk of injury to participants in co-recreational softball games. The court ruled that the league, ASA, Daniel's, and Thompson, as sponsors, and the American Legion, as owner of the field, owed the plaintiffs "a duty to refrain from reckless[ly] or intentional[ly] causing injury to a participant]." Rather than acting recklessly or intentionally to create a risk of injury, the court observed that the

defendants' alleged conduct involved the ordinary risks of injury inherent in playing recreational softball. Because the plaintiffs failed to allege anything "about the defendants' conduct which changed the obvious and inherent risk that the plaintiff could get hit by a ball during the softball game and that she could sustain serious injury if she failed to wear a helmet," the court concluded that plaintiffs' writ failed to state any claim upon which relief could be granted. Accordingly, the trial court dismissed all counts of the plaintiffs' writ.

On appeal, the plaintiffs argue that the trial court erred by applying the doctrine of assumption of the risk. Applying the doctrine, the plaintiffs contend, was error because under New Hampshire common law, the doctrine was historically applied only to employer-employee relationships and supplanted altogether when the legislature enacted the comparative fault statute. *See* RSA 507:7-d (1997).

"The standard of review in considering a motion to dismiss is whether the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery." *Dobe v. Comm'r, N.H. Dep't of Health & Human Services*, 147 N.H. 458, 460 (2002) (quotation omitted). The facts alleged in the plaintiff's pleadings are assumed true and all reasonable inferences are construed in the light most favorable to the plaintiff. *Id.* We will uphold the granting of a motion to dismiss when the facts pled do not constitute a basis for legal relief. *Id.*

## I. Comparative Fault Statute

We first examine the comparative fault statute and its effect upon common law negligence actions. RSA 507:7-d, in part, states:

> Contributory fault shall not bar recovery in an action by any plaintiff or plaintiff's legal representative, to recover damages in tort for death, personal injury or property damage, if such fault was not greater than the fault of the defendant, or the defendants in the aggregate if recovery is allowed against more than one defendant, but the damages awarded shall be diminished in proportion to the amount of fault attributed to the plaintiff by general verdict.

At common law, a plaintiff's contributory negligence was a complete bar to the recovery of damages. *See Lavoie v. Hollinracke*, 127 N.H. 764, 769 (1986) (interpreting predecessor comparative negligence statute). "[I]n an effort to allocate more equitably the responsibility for injuries due to negligent conduct on the part of parties on both sides of a lawsuit," the

legislature enacted the comparative negligence statute. *Id.* Thus, "[t]he applicability of the doctrine of comparative negligence is triggered by a plaintiff's negligence." *Id.* Where a plaintiff has not acted negligently in causing her own injury, there is no contributory negligence and the comparative fault statute does not apply. *Id.* The comparative fault statute does not apply in this case because the defendants do not claim that Carol Allen acted negligently in causing her own injury; rather, they argue that they owed no duty to protect her against the risk that she would be injured by an errantly thrown softball.

## II. Assumption of the Risk

We next determine the applicability of the doctrine of assumption of the risk. The defendants and the plaintiffs disagree on what the term "assumption of the risk" means and how it should be applied in this case. To resolve this issue, we must examine the history and various uses of the term "assumption of the risk."

The term "assumption of the risk" has been used to express distinct common law theories, derived from different sources, which apply when a plaintiff has knowingly exposed herself to particular risks. *See* Bohlen, *Voluntary Assumption of Risk*, 20 HARV. L. REV. 14, 15-30 (1906); *see also* W. P. KEETON, PROSSER AND KEETON ON TORTS § 68, at 480-98 (5th ed. 1984). The three distinct legal concepts encompassed by the term are: (1) a plaintiff's consent in exposing herself to a defendant's negligence; (2) a defendant's negligence together with a plaintiff's negligence which causes the plaintiff injury; and (3) a plaintiff's voluntary participation in a reasonable activity with known risks such that a defendant owes no duty to the plaintiff to protect against harm arising from those risks. *See Foronda v. Hawaii Intern. Boxing Club*, 25 P.3d 826, 833 (Haw. Ct. App. 2001).

The first theory, the express assumption of the risk, applies when a plaintiff assumes the risk of injury by expressly releasing a defendant from liability for negligent acts. *See Barnes v. N.H. Karting Assoc.*, 128 N.H. 102, 106 (1986). Under this theory, a defendant is not liable for injuries suffered by a plaintiff who consents to expose herself to the defendant's negligence. *Id.* Although New Hampshire law generally prohibits a plaintiff from releasing a defendant from liability for negligent conduct, in limited circumstances a plaintiff can expressly consent by contract to assume the risk of injury caused by a defendant's negligence. *See Dean v. MacDonald*, 147 N.H. 263, 267 (2001). For a plaintiff to assume such risk, the release must "clearly and specifically indicate[] the

intent to release the defendant from liability for personal injury caused by the defendant's negligence . . . ." *Id.* (quotation omitted). A defendant, however, will not be released from liability when the language of the contract raises any doubt as to whether the plaintiff has agreed to assume the risk of a defendant's negligence. *See Audley v. Melton,* 138 N.H. 416, 418-19 (1994); *Papakalos v. Shaka,* 91 N.H. 265, 267-68 (1941). Because a plaintiff's contract releases a defendant from liability under this theory, it completely bars a plaintiff's recovery, and therefore the comparative fault statute does not apply. *See* KEETON, *supra* at 496-97.

The second theory, the secondary implied assumption of the risk, applies to situations where a defendant breaches a duty of care owed to a plaintiff and the plaintiff also breaches a duty of care she owes to protect herself against the harm. *See Robinson v. Railroad,* 85 N.H. 474, 475-76 (1932). Although this theory is more aptly referred to as contributory negligence, the court has, at times, used the term "assumption of the risk" to describe a plaintiff's voluntary encounter, whether negligent or not, with a known danger created by a defendant's negligence. *See Vidal,* 86 N.H. at 6-7. Prior to the enactment of the comparative negligence statute, a plaintiff who was negligent in voluntarily encountering a known danger was barred from recovery. *See Brosor v. Sullivan,* 99 N.H. 305, 308 (1954). While on the other hand, a plaintiff who voluntarily encountered a known danger but acted reasonably was entitled to recover. *See id.* Under the comparative fault statute, a defendant is not relieved from liability for breaching a duty; instead, a plaintiff's contributory negligence is compared to the defendant's negligence to apportion fault in causing the plaintiff's injury. *See* RSA 507:7-d; *Townsend v. Legere,* 141 N.H. 593, 594-95 (1997); *see also Lavoie,* 127 N.H. at 769 (interpreting predecessor comparative negligence statute). As we noted above, the defendants, in this case, do not allege that Carol Allen acted negligently and therefore the comparative fault statute does not apply.

The third theory, the doctrine of primary implied assumption of the risk, applies when a plaintiff voluntarily and reasonably enters into some relation with a defendant, which the plaintiff reasonably knows involves certain obvious risks such that a defendant has no duty to protect the plaintiff against injury caused by those risks. *See Larsen v. Pacesetter Systems, Inc.,* 837 P.2d 1273, 1290-91 (Haw. 1992); *Goodale v. York,* 74 N.H. 454, 455 (1908). For example, in light of the "strenuous" nature of a basketball game, the owner of a gymnasium had no duty to protect a basketball player from the ordinary risk of being "knocked backward by an opposing player" and falling onto bleachers while participating in the

game. *Paine v. Association*, 91 N.H. 78, 79 (1940). This primary implied assumption of risk doctrine, the defendants argue, applies to this case. The plaintiffs, however, contend that this doctrine applies only where there is an employer-employee relationship. *See Vidal v. Errol*, 86 N.H. 1, 6-7 (1932) ("It is now well settled in this state that, outside the relation of master and servant, the [assumption of the risk doctrine] is not conclusive of [a plaintiff's] right to recover.") To comprehensively define and apply this no-duty rule, we must trace the origins of the doctrine.

The doctrine originated in the master-servant context. *See Kambour v. Railroad*, 77 N.H. 33, 41-45 (1913). In early common law, prior to developing the tort principle that one owes a duty to act reasonably to protect others from injury, the courts developed a contract principle that one owes a duty to act according to his agreement with others. *See id.* at 36-37. Thus, "[w]hen the relation was created by contract, the test of duty as to a particular danger was to inquire whether the defendant did and the plaintiff did not know of it." *Id.* at 39. In the master-servant context, where the master and his servant were brought together by contract, a master owed his servant no duty as to known dangers. *Id.* at 40. On the other hand, when a relationship was not created by contract, the fact that the plaintiff knew of the danger and voluntarily encountered it did not bar recovery, but was merely evidence to be considered on the issue of the plaintiff's negligence. *Id.* at 39. Even after adoption of the tort principle, however, the duties of those brought together by contract were defined by their contract. *See id.* at 37-38. However, when the relationship "was not created [by contract], the test to determine whether either party was in fault was to inquire whether he did what the ordinary man would have done to avoid the accident." *Id.* at 39.

By the early 1900's, the duty owed by a master to his servant changed. *See Genest v. Company*, 75 N.H. 365, 367-68 (1909). By that time, "this court ha[d] held both that it is the master's duty to maintain instrumentalities in the condition in which the ordinary man would maintain them and that servants do not assume the risk of injuries caused by his misconduct." *Kambour*, 77 N.H. at 45 (citations omitted); *see also Genest*, 75 N.H. at 367-68; *Goodale*, 74 N.H. at 455. The court, however, continued to apply the "assumption of the risk" label when analyzing cases that describe two distinct theories—a plaintiff who knew of the risks presented by a defendant's negligence and voluntarily encountered it, *see Brosor v. Sullivan*, 99 N.H. 305, 308 (1954), and a defendant who owed no duty to a plaintiff in light of a particular risk, *see England v. Tasker*, 129 N.H. 467, 470 (1987).

■ Under our present law, when a defendant breaches a duty owed to a plaintiff and the plaintiff knows of the danger presented by a defendant's negligence and voluntarily encounters it, the defendant may be held liable. *See Brosor*, 99 N.H. at 308. The fact that the plaintiff knew of the danger and voluntarily encountered it does not, in and of itself, bar the plaintiff from recovering for her injuries; rather, this fact is "merely evidence to be considered with other relevant facts on the issue of [the plaintiff's negligence]." *Kambour*, 77 N.H. at 49. Use of the term "assumption of the risk" to bar a non-negligent plaintiff's recovery merely because she knew that a defendant breached a duty owed to her has been repeatedly rejected by this court, which has held that a plaintiff does not assume the risk of injury simply by knowing of and voluntarily encountering a risk created by a defendant's negligence. *See Vidal*, 86 N.H. at 6-7; *Brosor*, 99 N.H. at 308.

■ When, however, a defendant owes no duty to a plaintiff in light of a particular risk, the defendant cannot be held accountable to a plaintiff who is injured upon the plaintiff's voluntary encounter with that risk. *See La Fontaine v. St. John*, 92 N.H. 319, 321 (1943) (employer had no duty to warn employee not to "occupy so precarious a position" when employer could not "have anticipated that any [employee] would [act in such a way]"). In other words, a defendant who has no duty cannot be negligent. *Walls v. Oxford Management Co.*, 137 N.H. 653, 656 (1993). Moreover, contrary to the plaintiffs' contention, the comparative fault statute does not supplant this common-law doctrine because a plaintiff's fault is irrelevant in determining whether a defendant has a duty. It is this third theory that is applicable here.

## III. Defendants' Duty

■ Under this theory, we must determine what duty if any the defendants owed to Carol Allen to protect her against the risk that she would be injured when she participated in the softball game. The defendants argue that they owed no duty to protect her against the risk that she might be injured when a softball struck her head because that was an ordinary risk of playing co-recreational softball, a reasonable activity in which she voluntarily participated. We conclude that when Carol Allen voluntarily played softball—a reasonable activity that she knew involved obvious risks—the defendants had no duty to protect her against injury caused by those risks.

However, even if there is no duty to protect a plaintiff against ordinary risks, we must address the standard of care that co-participants, sponsors and organizers owe to participants in recreational sports activities when

extraordinary risks are alleged. Generally, "persons owe a duty of care only to those who are foreseeably endangered by their conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous." *Manchenton v. Auto Leasing Corp.*, 135 N.H. 298, 304 (1992) (quotation and brackets omitted). Determining the standard of care in a particular case, *i.e.*, the duty placed upon a defendant under given circumstances, is a question of law. *See Young v. Clogston*, 127 N.H. 340, 342 (1985); *Walls*, 137 N.H. at 656. The standard of care against which a defendant's conduct is measured "is essentially an objective one," *Bernard v. Russell*, 103 N.H. 76, 77 (1960), and "is defined as how a reasonable man might act under the same circumstances," *Gelinas v. Metropolitan Prop. & Liability Ins. Co.*, 131 N.H. 154, 161 (1988) (quotation omitted).

The defendants argue that we should adopt a standard of care that holds participants, sponsors and organizers liable for reckless or intentional conduct only. Several other courts have adopted this standard of care for participants. *See Knight v. Jewett*, 834 P.2d 696, 711 (Cal. 1992); *Gauvin v. Clark*, 537 N.E.2d 94, 97 (Mass. 1989); *Turcotte v. Fell*, 502 N.E.2d 964, 968 (N.Y. 1986). Raising the standard to permit recovery only when conduct is reckless or intentional would permit participants to act unreasonably under the circumstances and escape liability for their negligent conduct, thus providing immunity for a defendant's wrongful conduct. "The prevailing rule of torts today is that where there is negligence by an individual or a corporation liability follows. Immunity is the rare exception." *Merrill v. Manchester*, 114 N.H. 722, 728 (1974) (citation omitted); *see also Sargent v. Ross*, 113 N.H. 388, 396 (1973). We thus decline to adopt the standard of care proposed by the defendants.

The defendants, however, argue that, "recreational athletic activities would be chilled without a recklessness standard." We believe that the negligence standard, properly understood and applied, is suitable for recreational athletic activities because the conduct of a participant, sponsor or organizer is measured against the conduct that a reasonable participant, sponsor or organizer would engage in under the circumstances. *See Lestina v. West Bend Mut. Ins. Co.*, 501 N.W.2d 28, 33 (Wis. 1993); *Auckenthaler v. Grundmeyer*, 877 P.2d 1039, 1043 (Nev. 1994).

Participating in a sport gives rise to "commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation." *Hacking v. Town of Belmont*, 143 N.H. 546, 553 (1999). Risks that are outside the range of the ordinary activity involved in the sport, however, do not reasonably flow from participation. *See id.* at 553-54. Thus, in ordinary negligence terms, a participant, sponsor or

organizer "who creates only risks that are normal or ordinary to the sport acts as a reasonable person of ordinary prudence under the circumstances." *Crawn v. Campo*, 630 A.2d 368, 373 (N.J. Super. Ct. App. Div. 1993) (quotation and brackets omitted), *aff'd as modified*, 643 A.2d 600 (N.J. 1994); *see also Bolduc v. Crain*, 104 N.H. 163, 167 (1962) (recognizing that participating in a horse pulling contest "has some dangers connected with it" and therefore defendant not liable for "normal dangers incident [to participating] in such a contest"). When one creates an unreasonable risk under the circumstances, however, he has breached the standard of care. *Crawn*, 630 A.2d at 373; *see also Hacking*, 143 N.H. at 553 (defendant liable for "unreasonably increased or concealed" risks not inherent in the game of basketball).

To determine the appropriate standard of care to be applied to participants, sponsors and organizers of recreational athletics, we consider: (1) the nature of the sport involved; (2) the type of contest, *i.e.*, amateur, high school, little league, pick-up, etc.; (3) the ages, physical characteristics and skills of the participants; (4) the type of equipment involved; and (5) the rules, customs and practices of the sport, including the types of contact and the level of violence generally accepted. *See Lestina*, 501 N.W.2d at 33. "A defendant may be held liable to the plaintiff for [unreasonably] creating or countenancing risks other than risks inherent in the sport, or for increasing inherent risks, and in any event will be held liable for reckless[] or intentional[] injurious conduct totally outside the range of ordinary activity involved in the sport, but liability should not place unreasonable burdens on the free and vigorous participation in the sport." *Foronda*, 25 P.3d at 841. A defendant, however, may not be held liable for negligent, or even reckless or intentional injurious conduct that is *not* outside the range of ordinary activity involved in the sport. *Cf. id.* (applying standard of care to boxing that recognizes "participants excel by injuring their opponents ... [and] the very acme of achievement for a boxer is to so batter the opponent as to induce a temporary coma—otherwise known as a knockout").

In this case, we first consider the nature of the sport of softball. The sport of softball is a reasonable activity, commonly played by men, women and children of varying skill levels. Consistent with this wide variety of players, a wide variety of rules are applied. Whether played by men, women or children, skilled or unskilled, participation in a softball game generally gives rise to the risk that a player may be struck by a ball that has been hit by a batter or thrown by a fielder.

The particular game, during which Allen was injured, was part of an adult co-recreational slow-pitch tournament. All of the players, including Carol Allen, were adults. Throughout the summer of 1998, the league generally regulated its games by applying the ASA rules. The plaintiffs do not allege that the players customarily wore helmets. The plaintiffs do, however, allege that in all games played prior to September 13, 1998, the league had only used one type of ball, which was designed for use in games played by men. The ball that the plaintiffs allege was used when Carol Allen was injured is designed for use in games played by women, single sex and co-ed teams, teenage girls and ten- to twelve-year-old boys.

Under the circumstances of this game, the only duty the defendants had was not to act in an unreasonable manner that would increase or create a risk of injury outside the range of risks that flow from participation in an adult co-recreational softball game. The plaintiffs argue the defendants' duty specifically included taking the following actions: (1) participants had a duty to not make errant throws when fielding the ball; (2) the league, Daniel's and Thompson had a duty to utilize all reasonable safety precautions in their conduct of the games; (3) the American Legion and ASA had a duty to promulgate or enforce rules that would minimize the risk of injury; and (4) ASA and Bollinger had a duty to warn, advise, inform and instruct the league regarding the risk of injury to participants and the manner in which such risks could be minimized. We examine each act the plaintiffs contend was required of the defendants in turn.

█ The plaintiffs first argue that the shortstop had a duty to not make an errant throw when fielding the ball. Participants in an adult co-recreational slow-pitch softball game have a duty to not create an unreasonable risk of injury. When fielding the ball, therefore, a fielder has a duty to not act unreasonably. In other words, the fielder has a duty to not act in a manner outside the range of the ordinary activity involved in playing softball. *Cf. Picou v. Hartford Ins. Co.*, 558 So.2d 787, 790 (La. Ct. App. 1990) ("[P]articipants have the duty to play the game in a reasonable manner, refraining from acts which are unexpected, unforeseen, or which evidence reckless disregard for the other players."). A fielder, however, does *not* have a duty to make only accurate throws. Because reasonable fielders commonly make errant throws, being injured by an errant throw is a common risk inherent in and arising out of a softball game. A fielder therefore cannot be held liable for errant throws that reasonably flow from participation. *See Hacking*, 143 N.H. at 553; *see also Totino v. Nassau Cty. Coun. of Boy Scouts*, 625 N.Y.S.2d 51, 52 (App. Div. 1995).

In this case, the plaintiffs allege that the shortstop fielded the ball and then threw it toward first base in an attempt to make an out. The throw, however, was inaccurate and struck Carol Allen's head as she ran toward first base. The plaintiffs' allegation describes a fielder whose conduct was within the ordinary range of activity involved in playing softball which, even if negligent, cannot as a matter of law constitute unreasonable conduct under the circumstances. *Cf. Totino*, 625 N.Y.S.2d at 52 (holding as a matter of law injury caused by player sliding into base is commonly appreciated risk inherent in playing softball). Accordingly, the plaintiffs' claim based upon the shortstop's errant throw does not constitute a legal basis for relief.

The plaintiffs next argue that the league, Daniel's and Thompson had a duty to utilize all reasonable safety precautions in their conduct of the games. Reasonable safety precautions, according to the plaintiffs' writ, "includ[ed] but [were] not limited to recommending, requiring, or providing batting helmets for the players, using less dangerous softballs, and maintaining proper male/female player ratios." Because we assume the facts as pled by the plaintiffs are true, we will assume that Daniel's and Thompson as team sponsors, in fact, conducted the game. To the extent a team sponsor conducts a game, it has a duty to conduct the game in a manner that does not unreasonably increase the risks that flow from the ordinary play of the game. *See Hacking*, 143 N.H. at 553.

The plaintiffs' complaint alleges that the team sponsors had a duty to conduct this game using certain equipment, specifically batting helmets and "less dangerous softballs." While the plaintiffs allege that batting helmets should have been used when conducting this game, they do not allege that batting helmets are ordinarily worn by players in adult co-recreational slow-pitch softball games. The ASA rules the plaintiffs allege applied to this game do not require batting helmets to be worn. Further, the plaintiffs do not allege that reasonable teams use batting helmets when playing in adult co-recreational softball games. They have thus failed to make an allegation that gives rise to a duty for these team sponsors to recommend, require or provide helmets when conducting an adult co-recreational softball game. Thus, under the circumstances of this game, not recommending, requiring or providing batting helmets did not unreasonably increase or create a new risk outside of the range of ordinary activity.

The plaintiffs further allege that the softball manufactured for use when adult men play softball is less dangerous than the softball manufactured for use when children and women play softball. The plaintiffs do not allege,

however, that anything other than an ordinary softball manufactured for use when adult women batted was used in this case. The ASA rules that the plaintiffs allege applied to this game require the use of the smaller ball to allow women batters to hit more competitively with men. The plaintiffs do not allege that the smaller, harder softball created a risk that was outside the range of ordinary activity involved in the sport of softball or unreasonably increased the inherent risk that when a softball struck her head she would be injured. Rather, the plaintiffs allege the particular softball used may have amplified the injury she otherwise would have suffered. Because the risk that a player may suffer an injury upon being struck by a ball is an ordinary risk incident to playing softball, using the smaller softball manufactured for use by women to allow the women in a co-ed game to hit more competitively with men did not unreasonably increase the ordinary risks inherent in the game. *Cf. Picou*, 558 So.2d at 790 (noting that injury arose out of same type of risk that is inherent in game). Therefore, the team sponsors' duty to Carol Allen did not include using the least "dangerous" softball available when conducting an adult co-recreational softball game. *Cf. Foronda*, 25 P.3d at 844 (holding as a matter of law that use of single spacer ties on boxing ring "did not create a new risk or increase the inherent risk of sparring"). Accordingly, it was not unreasonable under the circumstances of this game to use the smaller, harder softball, the one manufactured for use by women batters, when women batted.

Finally, the plaintiffs allege that the defendants had a duty to adhere to a strict five-male to five-female ratio. This allegation is apparently based upon the ASA rules of play for amateur softball. While the plaintiffs allege the ASA rules set forth a standard of care for recreational softball, the rules' stated purpose is to "regulat[e] competition to insure fairness and equal opportunity to the millions of players who annually play the sport." Further, the plaintiffs do not allege that adhering to that ratio is a measure ordinarily taken when conducting an adult co-recreational softball game. Being struck by a ball thrown by a male player is an ordinary risk inherent in co-ed softball. The ratio rule did not unreasonably increase or conceal the risk that Carol Allen would be struck by a ball thrown by a male player. *See Hacking*, 143 N.H. at 553. Moreover, the fact that a male player threw the ball that struck Carol Allen was not a new risk created by the three-female to seven-male ratio because even under the rules requiring a five-female to five-male ratio, two males were required to play in infield positions. Thus, by not using a strict five-female to five-male ratio the defendants did not unreasonably increase

her risk of injury or create a new risk outside the range of risks that ordinarily flow from participation in an adult co-recreational softball game. Therefore the defendants did not owe a duty to Carol Allen to adhere to the five-male to five-female ratio. Consequently, the plaintiffs' writ does not allege facts that, if true, would show that the defendants breached the duty they owed to Carol Allen to conduct the game in a manner that does not unreasonably increase the risks that flow with the ordinary play of the game.

The plaintiffs' writ also alleges that defendants American Legion, as owner of the softball field, and ASA, as sponsor of the league, had a duty to promulgate or enforce rules that would minimize the risk of injury. Given the risks inherent in and arising out of the sport of softball, the duty of organizations, whether involved in providing a field or sponsoring a league, is to "create only [those] risks that are normal or ordinary to the sport," or that would be created by a "reasonable person of ordinary prudence under the circumstances." *Crawn*, 630 A.2d at 373. The defendants thus have a duty to promulgate or enforce rules that minimize the risk of injury, if without those rules the game is otherwise unreasonably dangerous. *See Goodwin v. James*, 134 N.H. 579, 583-85 (1991). While the plaintiffs allege that promulgating and enforcing rules that required batting helmets, a larger, softer softball, or a certain male-female ratio would make the game safer, they do not allege that failing to promulgate and enforce such rules created risks outside the risks ordinarily involved in softball and made the game unreasonably dangerous. Consequently, the plaintiffs' writ does not allege facts that, if true, would show that the defendants breached the duty they owed to Carol Allen to promulgate and enforce rules that were necessary to minimize injury in an otherwise unreasonably dangerous sport. Therefore, it does not allege a basis for legal relief.

Finally, the plaintiffs allege ASA and Bollinger had a duty to warn, advise, inform and instruct the league regarding the risk of injury to participants and the manner in which such risks could be minimized. As we have previously stated, the defendants may not be held liable to the plaintiffs for creating or countenancing those risks inherent in the sport of softball. Moreover, while a defendant generally has no duty to warn and instruct a plaintiff of obvious dangers about which the plaintiff's knowledge and appreciation equal the defendant's, a defendant may be held liable when a reasonable person would customarily instruct a plaintiff in respect to the dangers inherent in an activity. *See Evans v. Foster*, 95 N.H. 194, 195 (1948). Thus, the defendants may be held liable if the

plaintiffs allege that a reasonable person would customarily warn, advise, inform and instruct the league regarding the risk of injury to participants and the manner in which such risks could be minimized and their failure to do so caused the plaintiff's injuries. The plaintiffs, however, do not allege that reasonable sponsors and insurers customarily warn or instruct leagues regarding the risk of injury to participants. Therefore the defendants, in this case, had no duty to warn and instruct the league regarding the risk of injury.

In sum, the plaintiffs' writ does not allege any facts from which one could reasonably infer that the standard of care required the defendants to recommend, require or provide helmets, use a less dangerous softball or maintain a ratio of five men and five women on each team, and therefore, the writ does not allege sufficient facts that the defendants unreasonably created a new risk outside the ordinary risks or unreasonably increased the inherent risk that Carol Allen would be injured when struck by a softball while participating in an adult co-recreational softball game. *Cf. Estes v. Tripson*, 932 P.2d 1364, 1367 (Ariz. Ct. App. 1997) (holding as a matter of law that base-runner who allegedly acted in ordinary and typical manner when he ran toward homeplate and stepped on catcher's outstretched leg, fracturing her tibia and fibula, did not unreasonably increase the inherent risks that catcher faced in a softball game and therefore did not breach duty). Because the plaintiffs' allegations do not constitute a legal basis for relief, the trial court properly dismissed the case. *See Young*, 127 N.H. at 342 (court may determine that defendant's conduct has conformed to standard as a matter of law).

*Affirmed.*

BROCK, C.J., and DALIANIS, J., concurred.